UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

BRUCE GIVEN and
MELISSA GIVEN,

            Plaintiffs,

v.                                    Civil Action No. 2:13-2070

AMERISTEP, INC.,
a Michigan corporation and
CABELA'S WHOLESALE, INC. and
PRIMAL VANTAGE COMPANY, INC.,

            Defendants.

                    MEMORANDUM OPINION & ORDER

            Pending are: (1) the defendants' motion seeking

sanctions for spoliation of evidence, filed March 6, 2014; and

(2) the defendants' motion to strike or, alternatively, amend

the scheduling order, filed May 13, 2014.


                              I.


            The dispute in this case arises from injuries that

Bruce Given suffered when he fell from an allegedly defective

hunting tree stand manufactured by Primal Vantage Company, Inc.

("Primal"), distributed by Ameristep, Inc. ("Ameristep"), and

sold by Cabela's Wholesale, Inc. ("Cabela's").  Mr. Given and

his wife, Melissa (collectively "the Givens"), seek relief under

a variety of state-law theories, including products liability,

negligence, and breach of warranty.

A.

The basic facts, somewhat condensed, are as follows.
On September 8, 2011, Mr. Given purchased a Team Realtree Buck
Buster ladder stand (the "tree stand" or "stand") from Cabela's.
The tree stand consists of a seat, bolted to a platform,
attached to the top of an eighteen-foot ladder, which is itself
comprised of four interconnected ladder segments.[1]  Once fully
assembled, the stand can be raised and affixed to a nearby tree,
providing a user with an elevated firing platform from which to
hunt.

The tree stand utilizes a "truss and cable" system
designed to provide rigidity to the overall structure and
prevent the ladder segments from separating.  To simplify
greatly, the system consists of a pair of truss arms attached to
the third ladder segment, and a truss cable that can be

---

[1] The tree stand's ladder is formed by four separate pieces.  For
ease, and to avoid confusion, the portion nearest to and
touching the ground will be referred to as the "bottom segment."
The segments immediately above the bottom segment are referred
to as the "second segment" and "third segment," respectively.
The final portion of the ladder, which connects the third
segment to the platform and seat, is identified as the "top
segment."

lengthened or shortened using a turnbuckle.  When properly installed, the truss cable is attached to the seat platform above the ladder and to the bottom segment of the ladder, then seated into a channel at the apex of the truss arms, and tightened until the ladder bows out slightly away from the adjacent tree.  The assembly instructions note that, "[i]f the ladder is perfectly straight or bowed in slightly toward [the] tree, [the] TRUSS IS TOO LOOSE," and the tree stand must be "re-set."  Similarly, if the "ladder appears to have an extreme outward arc in it," the instructions advise that the stand should be taken down and re-set.

### B.

On October 19, 2011, Mr. Given transported his tree stand to a tract of land located on Powell Mountain, in Nicholas County, West Virginia, which Mr. Given's hunting club leases for use during the State's hunting season.  Mr. Given claims that he and two other members of the hunting club, Mike Claxton and Rodney Kirk Cooper,[2] removed the tree stand from its packaging, read the assembly instructions and warnings, and assembled the

---

[2] During his deposition, Mr. Given identified his second companion only as Kirk.  From additional documents in the record, it appears that Kirk's full name is Rodney Kirk Cooper.

3

tree stand accordingly.

As relevant here, Mr. Given testified at his deposition that the men installed and adjusted the truss cable until they were satisfied that the arc of the ladder appeared to them to match the shape recommended in the manufacturer's assembly instructions.

Three days later, on October 22, 2011, Mr. Given returned to the tree stand, intending to hunt from it that day. Before climbing the ladder, he visually inspected the truss cable to make certain that it was "still attached to th[e] truss," and observed that the stand appeared otherwise unaltered.  According to Mr. Given, he then began to climb the stand, but, as he approached the platform, the third segment of the ladder bent inward towards the tree and separated from the top segment of the ladder, at which point Mr. Given fell to the ground below.

Mr. Given fell on his left side, and the bent, third segment of the ladder landed somewhere nearby.  In the moments after the fall, he observed that the truss cable had remained intact and that it was still connected to the seat platform and bottom segment of the ladder, but he was otherwise unable to ascertain exactly what prompted the ladder to give way beneath

4

him.

After laying on the ground "for a while," Mr. Given
called another member of the hunting club, Sam Zecco, explained
what had transpired, and asked for help.  Approximately ten
minutes after Mr. Given's phone call, Mr. Zecco and Mr. Claxton
arrived at the scene.  The three men remained at the accident
site for an unspecified period of time, during which Mr. Given
took a photograph of the bent ladder segment.  Mr. Given also
removed the bent ladder segment from the scene and retained it,
but he left the remainder of the tree stand untouched and did
not photograph it.  At his deposition, he testified that he did
not return to the accident site until approximately one year
later, at which point the tree stand was gone.  Mr. Given
indicated that he did not ask any of the other members of his
hunting club to retrieve the stand, and simply assumed that it
had been stolen.

C.

The Givens initiated this action on February 6, 2013,
and subsequently amended their complaint with the defendants'
consent on August 23, 2013.  Count I of the amended complaint
asserts claims against all of the defendants under a strict

product liability theory, alleging that the tree stand failed due to a design or manufacturing defect, or, alternatively, that the stand did not include satisfactory warnings.  Pls' Am. Compl. ¶¶ 11-12.  Count II pleads negligence, alleging that Primal breached its duties to properly design and manufacture the tree stand, and also breached its duty to adequately warn about the dangers of the stand.  Id. ¶ 14.  Count III claims that all of the defendants breached an express or implied warranty that the tree stand "was of merchantable quality, durable, safe and fit for it[s] stated and ordinary uses."  Id. ¶ 16.  Finally, Count IV charges Cabela's with negligence for "failing to monitor the products it sells and [] failure to reasonably inspect [t]he equipment it sells to customers."  Id. ¶¶ 18-19.

On March 6, 2014, the defendants moved for dismissal of the entire case as a sanction for the spoliation of evidence, alleging that the plaintiffs' failure to preserve the entire tree stand had significantly impaired their ability to defend this case.  By standing order, the motion was referred that same day to the Honorable Dwane L. Tinsley, United States Magistrate Judge, for proposed findings and recommendations.

Just over a week later, on March 17, 2014, the defendants filed two motions for summary judgment.  Both seek

6

summary judgment as to each of the plaintiffs' claims.  See
Defendants' Motion for Summary Judgment Relating to all of
Plaintiffs' Claims on No Design, Manufacturing or Warnings
Defect at 1 ("Defendants . . . move this [c]ourt for summary
judgment on each of [p]laintiffs['] claims"); Defendants' Motion
for Summary Judgment Relating to all of Plaintiffs' Claims on No
Proximate Cause (same).[3]  The plaintiffs opposed the motions.

     Both sides relied, to some extent, on the opinions of
experts who were retained to examine the bent ladder segment and
opine on the cause of Mr. Given's accident.  Both sets of
experts appear to agree that the observed deformation in the
ladder could not have occurred unless the ladder segments
separated while Mr. Given was climbing.  Unsurprisingly,
however, the experts drew different conclusions from that
observation.

     The plaintiffs expert, Dr. Bastiaan E. Cornelissen,
opined that the weight of a user climbing the ladder could cause
the ladder segments to separate if the truss cable were under-
tightened or became disengaged from the apex channel, and if the

---

[3] Apart from the fact that they articulate separate legal
arguments in favor of summary judgment, no reason for the
duplicative filings is readily apparent, save one: the combined
length of the memorandums submitted in support of the twin
motions runs to thirty pages, the total of which exceeds the
limit for briefing in support of a motion for summary judgment
set by the court's local rules.

ladder base was either suspended above the ground at the start of the climb or sunk into the ground during the climb. Cornelissen Rep. at 3.  Dr. Cornelissen stated that such failures were foreseeable, and could have been "easily remedied by providing cross bolts, pins, or similar securing devices at the ladder stand connection points" to prevent the ladder segments from separating.  Id.  According to his report, "Incorporating securing devices into the subject ladder stand design was technically and economically feasible and would have prevented" Mr. Given's accident.  Id.

Apart from his conclusions regarding the design of the tree stand, Dr. Cornelissen did not conduct any "destructive analysis" of the retained portion of Mr. Given's ladder and therefore offered no opinion as to the "chemical composition and mechanical properties of the actual steel used in the production of the ladder stand." Id.  He did note, however, that the bent ladder segment "did not exhibit abnormally brittle behavior." Id.

The defendants countered with two experts of their own.  The first, George Saunders, examined the bent ladder segment and concluded, to a reasonable degree of engineering certainty, that the accident was caused by Mr. Given's misuse of the tree stand, rather than any design or manufacturing defect.

8

Saunders Rep. ¶¶ 11, 13.  Although Mr. Saunders noted that his analysis was severely limited due to the lack of physical evidence, he was still able to make several findings that led to his ultimate conclusion.  First, after examining the engineering drawings for the tree stand, Mr. Saunders opined, contrary to Dr. Cornelissen's theory, that the ladder segments could not be physically separated if the truss cable was properly attached and seated in the apex channel, even if the truss cable was adjusted to its longest length (i.e., not tightened).  Id. ¶ 8. Second, he determined that the deformation observed in the bent ladder segment from Mr. Given's tree stand "could only occur if the [truss] cable assembly separated (i.e. broke) or the cable assembly was not in place on the truss arm per the [assembly] instructions at the time of the incident."  Id. ¶ 13.  Third, Mr. Saunders examined the channel at the apex of the truss arms where the truss cable would have rested if the stand were properly assembled.  He stated that, had the stand been properly assembled, evidence of contact between the truss cable and apex channel would have been present, but noted that "[c]lose examination of the truss arm bushing . . . did not reveal any physical evidence of contact between the truss arm" and cable. Id. ¶ 14.

The defendants' second expert, Lorne Smith, Jr., also

concluded that misuse of the tree stand caused Mr. Given's accident.  He examined the bent ladder segment and agreed with Mr. Saunders that the "physical evidence exhibited on th[at] part of the stand . . . [did] not show any sign that the [truss] cable was ever attached to the apex of the stand," specifically noting that there were "no physical marks on the apex showing that the cable had ever been installed."  Smith Rep. ¶ 11.  Mr. Smith additionally concluded that the tree to which Mr. Given chose to affix the stand was a second potential cause of the accident.  Specifically, he observed that "[i]t was very easy . . . to see that th[e] tree" to which the stand was affixed "had a severe lean to the side onto which the stand was [] placed," notwithstanding the fact that the manufacturer's instructions specified that the stand should not be used with a tree that was leaning.  Id. ¶ 14.  Consequently, he opined that "[t]he fact that th[e] tree was leaning over 11 inches [wa]s the reason [Mr. Given] fell backwards away from the tree after the [ladder] leg separated."  Id.

Thus, at the end of March, the case appeared ready for summary judgment.  The parties disputed whether the tree stand had been improperly designed, and disagreed, based on the limited examination of the physical evidence and Mr. Given's testimony, about whether the stand had been properly assembled.

D.

On April 11, 2014, new wrinkles began to emerge.
After the motions for summary judgment were filed and fully
briefed, and well after the discovery completion deadline set
forth in the court's amended scheduling order, the defendants
deposed Mr. Claxton and Mr. Cooper.  In their depositions, both
men provided testimony concerning the fate of the remaining tree
stand evidence that conflicted with Mr. Given's account.

According to Mr. Claxton, some of the remaining pieces
of the ladder stand were stored in the hunting club's lodge for
approximately one year after Mr. Given's fall.  He did not know
how the stand came to be stored there, and was not sure whether
the truss cable had been preserved.  However, Mr. Claxton did
recall that Mr. Given ultimately gave the platform and seat
portions of the stand to Mr. Cooper as compensation for Mr.
Given's share of the cost of a porch that had been built onto
the club's lodge.

Mr. Cooper testified that, a week or two after the
accident, Mr. Given asked him and Mr. Claxton to retrieve the
tree stand and bring it to the club's lodge.  According to his
deposition testimony, he and Mr. Claxton retrieved the platform,
the seat, and "whatever ladder parts [Mr. Given] did not take

11

with him" on the day of the accident.  Mr. Cooper also remembered seeing the truss cable at some point, but did not know whether it was ultimately retained.  Finally, Mr. Cooper confirmed that he received the top portion of the stand as payment for Mr. Given's share of the porch costs.  In his telling, Mr. Claxton reached a verbal agreement with Mr. Given regarding the trade and relayed that information to Mr. Cooper, who then took possession of the stand pieces.

In response, Mr. Given filed a two-paragraph affidavit in which he refuted the central elements of Mr. Claxton's and Mr. Cooper's testimony.  Specifically, Mr. Given stated that he does not recall asking anyone to retrieve any pieces of the ladder stand following his accident, that he was not aware that any "components of the ladder stand [he] fell from still existed," and that he did not recall agreeing to sell or transfer any part of the ladder stand.

The discovery that the tree stand had, perhaps, not been stolen and that additional physical evidence might be available after all set off a further round of briefing and motions.  First, on April 30, 2014, the defendants filed a "supplemental brief" in support of their motion for spoliation sanctions.  On May 13, 2014, they moved to exclude "additional physical ladderstand evidence" -- apparently, by that time,

"most of the remaining components [of the tree stand] have been recovered and [we]re in the possession of [p]laintiffs' [c]ounsel." -- or, in the alternative, sought to reopen discovery.

Two weeks later, on May 27, 2014, the defendants filed a motion in limine also seeking to exclude the newly discovered tree stand evidence.  Documents attached to that motion indicate that the plaintiffs' expert, Dr. Cornelissen, has already examined at least some of the new evidence, and either modified his previous opinions or formed new opinions about the case as a result.  Dr. Cornelissen has not, however, filed an amended expert's report, and nothing in the record clearly indicates precisely what the newly discovered evidence consists of.

On June 2, 2014, after failing to respond to either of the defendants' motions to exclude the new evidence, the plaintiffs moved to modify the amended scheduling order, seeking, among other things, an extension of time to file responses to the defendants' motions in limine.  Finally, on Thursday, June 5, 2014, the court held a telephonic conference with counsel for both parties to discuss the newly discovered evidence and its potential impact on the case.

II.

When the defendants believed that all but one portion of the tree stand had been lost, they claimed that they were unable to mount a defense and argued that this case should be dismissed, see Defs' Mot. Spoliation; now that some of the missing evidence has apparently been located, they want it excluded, see Defs' Mot. to Strike or Reopen Discovery. Complicating matters further is the fact that the plaintiffs have not moved, in any way, to add the newly discovered physical evidence to the record by supplementing their opposition to the defendants' motions for summary judgment. Thus, while it is reasonably clear that the defendants no longer believe they need the new evidence to mount a defense in this case, it is entirely unclear what the newly discovered evidence consists of, or whether the plaintiffs intend to rely upon it.

In any event, the evidentiary dispute that lies at the heart of the motion for spoliation sanctions and the motion to exclude must be resolved before this case can move forward.  As a result, the court will withdraw the March 6, 2014 reference in this matter, and consider both motions, now, together.

14

A.


"A party seeking sanctions based on the spoliation of evidence must establish . . . that the alleged spoliator had a duty to preserve material evidence," and "thereafter willfully engaged in conduct resulting in the evidence's loss or destruction." Turner v. United States, 736 F.3d 274, 282 (4th Cir. 2013). The duty to preserve evidence "arises 'not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.'" Id. (quoting Silvestri v. Gen. Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001)). To establish the element of "willfulness," the party seeking sanctions must show that the alleged spoliator acted intentionally, rather than merely negligently, but need not prove bad faith. Id.

"Dismissal constitutes 'the ultimate sanction' for a spoliation infraction." Nichols v. Steelcase, Inc., No. 04-434, 2005 WL 1862422, at *9 (S.D. W. Va. Aug. 4, 2005) (citing Silvestri, 271 F.3d at 593). Before imposing such a harsh sanction, a district court must "consider both the spoliator's conduct and the prejudice caused and be able to conclude either (1) that the spoliator's conduct was so egregious as to amount

to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim." Silvestri, 271 F.3d 593.  In all cases, however, "dismissal should be avoided if a lesser sanction" is sufficient to level the evidentiary playing field and preserve the integrity of the judicial process.  See id. at 590 (explaining that the district court should choose a sanction appropriately molded to "serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine" (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)).

In this case, it appears beyond dispute that the plaintiffs had a duty to preserve the tree stand evidence.  Mr. Given maintains that he failed to do so because he did not initially intend to file a lawsuit arising out of his injuries. Whatever his initial intentions, he retained counsel within three months of his accident, and -- at least according to him -- still failed to return to the accident site, or take any other measures to preserve the evidence, for a further nine months.

As punishment, the defendants argue that this case should be dismissed inasmuch as Mr. Given's failure to preserve the entirety of the tree stand substantially denied them the ability to defend the claims against them.  As their motions for

16

summary judgment demonstrate, however, this is simply not so.

Both parties had an opportunity to submit the retained bent ladder segment to their respective experts, and experts for both sides rendered opinions about the cause of the accident. Neither expert suggests that the bent ladder segment was in some way mechanically defective, a point which the defendants highlight in arguing that the Givens cannot prove a manufacturing defect in this case on the basis of the bent ladder segment alone.

With respect to the design defect and failure to warn claims, the actual tree stand used in this case is largely irrelevant. There is no suggestion that the warnings included with the stand differed in any material way from the warnings that were included with Team Realtree Buck Busters in the ordinary course of commerce, and those warnings can be evaluated on their merits whether the tree stand in this case was preserved or not. Indeed, the defendants' experts have opined that the "warnings and instructions . . . were adequate for their intended purpose and met or exceeded industry standards." Defs.' Sum. J. Mem. at 16.

As for the design defect claim, the plaintiffs, relying on their expert, essentially argue that the tree stand

was defective because it was possible for the ladder segments to separate while a user was climbing the ladder.  The defendants' experts directly refute this contention, opining that the ladder segments could not be separated unless the truss cable was improperly assembled.  The important point, however, is that both sets of experts were able to reach their conclusions by analyzing the engineering drawings and design of the tree stand without the need to examine or test a fully assembled stand, let alone Mr. Given's specific stand.  Moreover, the defendants assert, based on evidence gleaned from the limited physical evidence initially preserved, that Mr. Given's design defect claim is foreclosed because he in fact misused the tree stand by failing to properly assemble the cable and truss system.  From all of this, it hardly appears that the defendants were unable to defend their case when the bent ladder segment was the only known piece of physical evidence.  Indeed, that notion is underscored by the fact that the defendants have now moved to exclude the physical evidence that they previously claimed was critical to their ability to defend.

    Following the depositions of Mr. Claxton and Mr. Cooper, the defendants "supplemented" their motion for sanctions, arguing in the alternative that dismissal was appropriate because Mr. Given acted in bad faith.  Specifically,

they assert that Mr. Given intentionally misled the defendants and the court to believe that the remaining portions of the ladder stand had been stolen, when in fact he had directed Mr. Claxton and Mr. Cooper to collect and retain the physical evidence. As noted, however, Mr. Given has responded with an affidavit refuting the testimony of Mr. Claxton and Mr. Cooper, and denying any involvement in removing and storing the tree stand after his accident. Moreover, after learning that remaining portions of the tree stand were still in existence, the plaintiffs apparently undertook to collect them for analysis.

In sum, it appears that the defendants were able to mount an adequate defense in this case even before the missing tree stand evidence was discovered. And the court cannot find, on the basis of the evidence submitted thus far, that Mr. Given's "conduct was so egregious as to amount to a forfeiture of his claim." As a result, dismissal is not an appropriate sanction in this matter.

Nevertheless, and notwithstanding that some parts of the missing tree stand evidence have now been located, the plaintiffs' failure to preserve the tree stand has complicated the defendants' ability to prepare their case and the nature of this litigation. Accordingly, as set forth more fully below,

the court will impose monetary sanctions to remedy additional
costs to the defendants caused by the plaintiffs' initial
failure to preserve the tree stand evidence.

B.

The defendants also argue that the newly discovered
evidence should be excluded pursuant to Federal Rule of Civil
Procedure 37, because: the plaintiffs acted in bad faith by
concealing the evidence; the evidence would be "untimely" if
admitted and prejudicial to the defendants; and the provenance
of the evidence is uncertain.  Alternatively, they seek to
reopen discovery to assess the relevance of the newly discovered
evidence, at the plaintiffs' expense.

In its entirety, Rule 37(c)(1) reads:

> If a party fails to provide information or identify a
> witness as required by Rule 26(a) or (e), the party is
> not allowed to use that information or witness to
> supply evidence on a motion, at a hearing, or at a
> trial, unless the failure was substantially justified
> or is harmless.  In addition to or instead of this
> sanction, the court, on motion and after giving an
> opportunity to be heard: [(A) may order payment of the
> reasonable expenses, including attorney's fees, caused
> by the failure; (B) may inform the jury of the party's
> failure; and (C) may impose other appropriate
> sanctions, including any of the orders listed in Rule
> 37(b)(2)(A)(i)-(vi)].

Fed. R. Civ. P. 37(c)(1)(A)-(C).

20

Whether a party's nondisclosure of evidence was substantially justified or harmless is guided by a five-factor test.  As our court of appeals has explained, a district court should consider:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003); see also Wilkins v. Montgomery, --F.3d--, No. No. 13-1579, 2014 WL 1759083, at *5 (4th Cir. May 5, 2014) ("[T]he district court was not required to tick through each of the Southern States factors.  Southern States explains that district courts have 'broad discretion' to decide harmlessness and 'should' -- not 'shall' -- 'be guided by' the five factors.").

Of course, the need to undertake that analysis presupposes that the nondisclosing party has moved to use the evidence at a trial, at a hearing, or in support of a motion.  See Fed. R. Civ. P. 37(c)(1); see also Southern States, 318 F.3d at 596-97 ("The language of Rule 37(c)(1) provides two exceptions to the general rule excluding evidence that a party seeks to offer but has failed to properly disclose[.]" (emphasis

added)).  In this case, as noted, the plaintiffs have not filed
an amended expert's report or moved to supplement their
opposition to the defendants' motions for summary judgment, nor
have they indicated that they intend to use the newly discovered
tree stand evidence at trial.  Rather, the defendants, having
discovered the existence of the evidence through their
depositions of Mr. Claxton and Mr. Cooper, are now effectively
seeking to preempt the possibility that it will be used against
them.

        The resulting uncertainty concerning the nature of the
evidence and the extent to which the plaintiffs intend to rely
upon it would make ruling on the motion to exclude premature at
this stage.  Without knowing more about the newly discovered
evidence, the court is, at a minimum, constrained in assessing
the level of surprise its introduction might cause as well as
the defendants' ability to cure that surprise.  More
importantly, the record is nearly devoid of any information that
would allow the court to assess the importance of the newly
discovered evidence.  Accordingly, it appears that the better
course is to deny the motion to exclude without prejudice at
this time, pending a limited period of discovery tailored to
permit the parties to determine what, if any, impact the newly
discovered tree stand evidence will have on this case.

III.


Parts of the tree stand, once thought lost, have now
been found.  It is unclear how this new discovery will affect
this case.  What is clear, however, is that the plaintiffs'
failure to preserve the tree stand evidence in the first
instance is at the root of the resulting uncertainty and
procedural complexity.  Accordingly, and having discussed the
matter previously with counsel during the June 5, 2014
teleconference, it is ORDERED as follows:

1.  That defendants' motion to exclude (ECF No. 52) be,
and it hereby is, denied without prejudice;

2.  That defendants' motion to impose sanctions for
spoliation of evidence (ECF No. 37) be, and it hereby
is, denied insofar as the motion seeks dismissal as a
sanction and is otherwise denied without prejudice
except to the extent granted by the relief set forth
below;

3.  That plaintiffs be, and they hereby are, directed to
file a supplemental expert's report, with such report
to address the relevance of the newly discovered tree
stand evidence, by not later than June 30, 2014;

4.  That plaintiffs be, and they hereby are, directed to
send, at their own expense, all of the tree stand
evidence, including the newly discovered evidence, to
an address specified by the defendants in order to
facilitate inspection of the evidence by the
defendants' experts;

5.  That defendants be, and they hereby are, directed to
take care that the physical evidence is preserved and
not damaged while it is in their custody;

6.    That defendants be, and they hereby are, directed to return the physical evidence to the plaintiffs following its inspection by the defendants' experts;

7.    That plaintiffs be, and they hereby are, directed to reimburse the defendants for the reasonable cost of returning the physical evidence;

8.    That the parties be, and they hereby are, directed to appear by counsel telephonically for a status conference on Friday, July 18, 2014, at 10:00 a.m., at which conference counsel shall be prepared to discuss a proposed date for the deposition of the plaintiff's expert and a date by which the report of the defendants' counter expert or experts is to be furnished;

9.    That plaintiffs be, and they hereby are, directed, at their own expense, to make the plaintiffs' expert available for deposition at the date and time to be determined during the July 18, 2014 teleconference; and

10.   That plaintiffs be, and they hereby are, directed to pay the reasonable fees and costs incurred by the defendants for one attorney to appear and take the deposition of the plaintiff's expert.


The Clerk is directed to transmit a copy of this order to all counsel of record and to any unrepresented parties.

DATED: June 12, 2014

John T. Copenhaver, Jr.
United States District Judge